IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SALSBUREY,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | CASE NO. 1:25-cv-2319<br><br>DISTRICT JUDGE<br>DAVID A. RUIZ<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Michael S. Salsburey filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying his applications for disability insurance benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In October or November 2023,[1] Salsburey filed applications for disability insurance benefits and supplemental security income alleging a disability

---

[1]    There is a discrepancy in the record regarding when Salsburey filed his applications. *See* Tr. 25, 225, 227. Because the date Salsburey filed his

onset date of February 28, 2019.[2] *See* Tr. 225, 227. In pertinent part, Salsburey claimed that he was disabled and limited in his ability to work due to depression, other specified trauma, anxiety, back injury, and persistent cough. *See* Tr. 284. The Commissioner denied Salsburey's applications initially and on reconsideration. Tr. 84, 93, 103, 112.

In May 2024, Salsburey requested a hearing. Tr. 152. In November 2024, Administrative Law Judge ("ALJ") Stacy Appleton held a telephonic hearing. Tr. 51–82. Salsburey appeared, testified, and was represented by counsel at the August 2024 hearing. *See* Tr. 54–58. Qualified vocational expert Kathleen Byrnes also testified. Tr. 75–81. Later in November 2024, the ALJ issued a written decision finding that Salsburey was not entitled to benefits. Tr. 25–45.

In January 2025, Salsburey appealed the ALJ's decision to the Appeals Council. *See* Tr. 224. In August 2025, the Appeals Council denied Salsburey's appeal, making the ALJ's November 2024 decision the final decision of the Commissioner. Tr. 9; *see* 20 C.F.R. § 404.981.

Salsburey timely filed this action in October 2025. Doc. 1. In it, he presents one issue for review:

> The ALJ failed to adequately evaluate and account
> for the social interaction limitations opined by both

applications is not determinative of the Salsburey's arguments, the Court has no need to resolve the discrepancy here.

[2]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

> state agency reviewing mental health experts, leading to an inaccurate residual functional capacity. [3]

Doc. 7, at 2.

**Evidence**[4]

*Personal and Vocational Evidence*

Salsburey was born in 1971, making him approximately 48 years old on the alleged onset date. Tr. 84

*Medical Evidence*

The ALJ summarized the medical evidence as follows:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity. The treatment notes show the claimant has undergone treatment for depression, PTSD, degenerative disc disease, asthma, COPD, and obesity. The claimant reported that his depression, anxiety, respiratory symptoms and musculoskeletal pains were the main impairments that prevented him from working. The objective medical evidence in the record does not show that the claimant's impairments are as debilitating as he alleges or

---

[3]     A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[4]     The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

3

cause restrictions greater than the above listed residual functional capacity.

The claimant has a few mental impairments, which further limits him to the above-described residual functional capacity. However, the description of the symptoms and limitations that the claimant has provided throughout the record has generally been inconsistent. As a threshold matter, the undersigned is cognizant of the substantial overlap in symptomology between mental impairments, as well as the inherently subjective nature of mental diagnoses. However, the medical evidence in the record does not show that the claimant's mental impairments are debilitating or cause restrictions greater than the above listed residual functional capacity.

The evidence in the record also shows that the claimant also has a treatment history for several physical impairments. However, the description of the symptoms and limitations that the claimant has provided throughout the record has generally been inconsistent. The notes indicate that the claimant reported having headaches, cough, shortness of breath, stiffness, pain, weakness and tenderness throughout his musculoskeletal system, back, hand and joint pains, and fatigue (Exhibit 5F page 1: Exhibit 8F page 3, page 13, and page 21: Exhibit 10F page 9: Exhibit 12F page 7: Exhibit 17F page 10, page 15). However, the objective diagnostic imaging, treatment history and lab reports do not support the claimant's allegations.

Furthermore, his imaging and lab results routinely showed no major abnormalities. A chest X-ray from February 12, 2019, showed no acute process (Exhibit 8F page 13). An X-ray of his chest from July 24, 2019, showed no acute findings (Exhibit 8F page 18). A pulmonary function test showed obstructive lung disease pattern (Exhibit 8F page 18). However, the inspiratory flow rate was normal (Exhibit 8F page 19). An X-ray of his lumbar spine from December 22, 2020, showed mild lumbar spondylosis and slight

dextro-convex curvature of the lumbar spine (Exhibit 8F page 84). However the vertebral bodies were normal height, the disc spaces were maintained, and the SI joints were normal (Exhibit 8F page 84). A CT scan of his chest from February 22, 2021, showed new patch ground glass opacities in the right lung which were non-specific, linear atelectasis or scarring within the bilateral lower lobes, right non-obstructive nephrolithiasis and a small hiatal hernia (Exhibit 8F page 111). However, there was no pneumothorax, evidence of pleural or pericardial effusion and (Exhibit 8F page 110). An X-ray of his left finger from December 12, 2023, showed soft tissue edematous (Exhibit 8F page 7). However, there was no acute displaced fracture and no foreign body (Exhibit 8F page 7).

The evidence in the record shows that the claimant has a mostly routine and conservative treatment history for his mental impairments. This treatment included therapy, counseling and medication management (Exhibit 1F page 2). On March 18, 2020, he presented for a follow up examination and reported that he had been more irritable (Exhibit 1F page 1). He stated that he was having issues with his adult daughter and his girlfriend's family, with them physically confronting him (Exhibit 1F page 1). However, he also stated that he did not respond when confronted (Exhibit 1F page 1). Further, he stated that he was sleeping better, that he did not need Trazodone and never used his previous prescription (Exhibit 1F page 1). Additionally, he denied experiencing suicidal or homicidal ideation, plan, or intent (Exhibit 1F page 1). He denied experiencing any sided effects (Exhibit 1F page 1). On examination, he was irritable and demanding (Exhibit 1F page 4). However, he was also alert, oriented and have average eye contact (Exhibit 1F page 4). Furthermore, he had normal psychomotor activity, a full affect and normal posture (Exhibit 1F page 4). Additionally, he had clear speech, logical thought processes and normal thought content without perceptions, hallucinations, or delusions (Exhibit 1F page 5). He also had normal cognition,

5

normal intelligence, and normal insight and judgment (Exhibit 1F page 6). The claimant was advised to continue therapy, but no further treatment was recommended (Exhibit 1F page 6).

By April 15, 2020, he reported feeling more stable and that he still did not need to take Trazadone (Exhibit 1F page 8). The later treatment notes showed that he continued to receive therapy treatment (Exhibit 1F page 50). He at times reported that his symptoms were not adequately controlled and had an abnormal review of systems on examination (Exhibit 1F page 50). However, he continued to deny experiencing suicidal or homicidal ideations and the only treatment recommended was continued therapy and medication management (Exhibit 1F page 51). By March 16, 2021, he reported that he was doing well (Exhibit 2F page 1). He stated that his back was bothering him and that he continued to need counseling (Exhibit 2F page 1). On examination, he had some agitation noted when talking about COVID and the government and he had an irritable mood and obsessional thought content (Exhibit 2F pages 4 - 5). However, he denied having worsening of irritability, suicidal or homicidal ideations, plan or intent (Exhibit 2F page 4). Further, he was alert, oriented, cooperative and he had clear speech (Exhibit 2F page 4). Additionally, he had logical thought processes, normal cognition and no hallucinations or delusions noted (Exhibit 2F page 5). The claimant was only advised to continue therapy, counseling and medication management (Exhibit 2F page 2). However, no more aggressive form of treatment was recommended.

During an examination on December 8, 2021, he reported that he was doing "pretty good" and that his mood was more stable (Exhibit 2F page 38). Further, he stated that his sleep and appetite were good, and he continued to deny experiencing suicidal or homicidal ideations (Exhibit 2F page 38). During an examination on January 10, 2022, he reported that he had more of an "attitude lately", with him

6

feeling more agitated and anxious (Exhibit 2F page 44). However, he also reported that he was doing "okay" and stated his sleep and appetite were still good (Exhibit 2F page 44). By February 9, 2022, he reported that he was doing "good" and that he was buying a new truck (Exhibit 2F page 50). He stated that his mood was stable and that his sleep and appetite were still normal (Exhibit 2F page 50). By March 9, 2022, he reported that he felt his medications were working and he was still doing "good" (Exhibit 2F page 57). The claimant was only advised to continue his prescription protocol, therapy and counseling but no further treatment was recommended (Exhibit 2F page 57).

By May 4, 2022, the claimant reported that he was still doing "okay" and watched his granddaughter while his daughter worked (Exhibit 2F page 69). Further, he stated that his anxiety was controlled, that the increase in his Buspar dosage was helpful and he denied experiencing depressed or irritable (Exhibit 2F page 69). Additionally, he denied experiencing suicidal or homicidal ideations and stated his sleep and appetite were still well (Exhibit 2F page 69). During an examination on August 2, 2022, he reported that he was worried about his pregnant daughter and felt irritable (Exhibit 2F page 88). He stated that Trazadone made him restless, and his sleep was poor (Exhibit 2F page 88). However, he also stated that his anxiety was still controlled, and he denied feeling depressed (Exhibit 2F page 88). Further, he stated that his appetite was good, and he did not want to explore any further sleep medication options (Exhibit 2F page 88). Additionally, he continued to deny experiencing suicidal/homicidal ideations, plan or intent (Exhibit 2F page 88). The claimant's prescription protocol was adjusted, with his Trazadone prescription discontinued and he was advised to continue therapy, counseling and medication management (Exhibit 2F page 89). However, no further treatment was recommended.

During later examinations, the claimant reported feeling stressed about not talking to his daughter and about his living situation (Exhibit 3F page 24). He reported having poor sleep (Exhibit 3F page 24). However, he continued to report that his anxiety was controlled, and he continued to deny experiencing depression, suicidal/homicidal ideations, plan or intent (Exhibit 3F page 24, page 30). During an examination April 20, 2023, he reported that he was more emotional and crying easily (Exhibit 3F page 43). However, he stated that he was happy because his granddaughter and daughter were living with him (Exhibit 3F page 43). Further, he stated that even though he had not taken any medications, his anxiety was controlled, and he sleep was fair (Exhibit 3F page 43). Additionally, he stated that his appetite was good, and he denied having suicidal or homicidal ideations (Exhibit 3F page 43). The claimant was only advised to continue his medication and therapy (Exhibit 3F page 44). Furthermore, by December 18, 2023, he reported that he was doing "okay" (Exhibit 6F page 1). He reported that he stopped taking his Abilify prescription because it caused restless legs (Exhibit 6F page 1). He reported feeling more irritable and to having auditory hallucinations (Exhibit 6F page 1). However, he stated that his restless legs had improved, that he felt his life had gotten better and he was recently baptized (Exhibit 6F page 1). He also stated that he was recently ordained in the priesthood, that his sleep was fair, and his appetite was good (Exhibit 6F page 1). He continued to deny having suicidal or homicidal ideations, intent or plan (Exhibit 6F page 1). The claimant's prescription protocol was again adjusted with him being prescribed Latuda and he was advised to return in 4 weeks (Exhibit 6F page 1). However, no further treatment was recommended.

The evidence in the record showed that the claimant has a treatment history for his physical impairments. On December 12, 2023, he presented to the ER with reports of a laceration of his left index finger (Exhibit 8F page 2). He reported he injured

8

his hand after using a circular saw (Exhibit 8F page 2). On examination, he had a laceration but declined numbing medication to better examine his finger (Exhibit 8F page 2). He reported having a hatred of needles and after the wound was touched, he adamantly stated that he could not tolerate further poking by a needle and asked for the exam to stop (Exhibit 8F page 2). He asked for his dressing to be applied and stated that he could not have anything done to his finger without "being put under" (Exhibit 8F page 2). The notes indicate that dressing was applied with aluminum finger splint for protection (Exhibit 8F page 2). He was prescribed medication and referred to an ortho for follow up (Exhibit 8F page 2). However, no more aggressive form of treatment was recommended before he was discharged in stable condition (Exhibit 8F page 2).

On January 8, 2024, he presented for the consultative physical examination and reported that he injured his lower back while in the military (Exhibit 5F page 1). He reported that he was also in two motor accidents and had a constant aching pain in his lower back with stiffness (Exhibit 5F page 1). However, he stated that he was only treated conservatively and was not receiving any ongoing medical treatment for his lower back presently (Exhibit 5F page 1). He also denied having any radicular or long tract signs or symptoms, bowel or bladder dysfunction (Exhibit 5F page 1). He stated that he had limitations in sitting, standing, walking, lifting and carrying but could not quantify those limitations and denied using crutches, a cane, walker, wheelchair, splints, braces or TENS unit (Exhibit 5F page 1). He reported that he had occasional crowd anxiety, mood swings, easy irritability and concentration difficulty, and a chronic cough (Exhibit 5F page 1). However, he stated that he had no medical diagnosis for his cough and stated that the only medications he took were psychotropic medications (Exhibit 5F pages 1 – 2).

On examination, the claimant had a BMI of 34.9 and a stiffened gait, complaining of lower back pain and

9

his active motion in his neck were restricted by pain inhibition in the dorsolumbar spine (Exhibit 5F page 2, page 4). He also had constant, moderate, involuntary spasm to inspection and palpation of the lumbar paravertebral muscles and diffuse tenderness to palpation over the lower back areas (Exhibit 5F page 4). However, he otherwise had a mostly normal review of systems, with normal breathing sounds, and he did not use a splint, brace or ambulatory device (Exhibit 5F page 2). Furthermore, he had intact visual fields, did report having shortness of breath and he had negative Romberg testing (Exhibit 5F page 2). Additionally, he had normal sensation in his face, intact cranial nerves, and normal speech (Exhibit 5F page 2). The claimant had normal heart rate and rhythm, normal shoulder shrug, and no clubbing, cyanosis, edema, wheezing, rales, rhonchi, gallops, murmurs, atrophy, ascites, masses, swelling, discoloration, or gross deformities noted (Exhibit 5F page 3). Further, he had normal strength testing in all muscle groups in the upper and lower extremities, normal grip strength and no joint tenderness, crepitus, effusion, gross ligamentous laxity, scoliosis, or intrinsic muscle atrophy was noted (Exhibit 5F page 4). Additionally, he had normal ability to grasp, manipulate, pinch and do fine coordination activities and he had no spasm or tenderness in his neck or middle back areas (Exhibit 5F page 4). The claimant had normal deep tendon reflexes in his extremities, negative straight leg raising, and no spasticity, clonus or primitive reflexes noted (Exhibit 5F page 4). Furthermore, he was alert, oriented, pleasant, had normal memory and was able to follow directions (Exhibit 5F page 4). He had decreased range of motion in his lumbar spine and decreased strength in his thoraco-lumbar spine (Exhibit 5F page 7, page 9). However, he had normal range of motion in cervical spine, shoulders, elbows, wrists, hands, hips, knees, ankles and hallux (Exhibit 5F pages 7 – 8). Additionally, he had normal strength elsewhere (Exhibit 5F pages 8 - 10).

10

Furthermore, his later imaging results continued to show no major abnormalities. An X-ray of his lumbar spine from January 8, 2024, showed mild to moderate degenerative changes of the lower lumbar spine (Exhibit 4F page 1: Exhibit 8F page 85). However, there was no acute osseous abnormality and no significant interval change (Exhibit 4F page 1). An X-ray of his lumbar spine from September 17, 2024, showed multilevel degenerative changes but without radiographically demonstrated instability (Exhibit 17F page 13). The sacroiliac joints and hips were preserved (Exhibit 17F page 13). A CT scan of his chest from September 18, 2024, showed regions of atelectasis within both lungs, calcified granulomas within the right apex, mild diffuse bronchiectasis and trace right sided pleural effusion (Exhibit 11F page 4). However, there was no frank lymphadenopathy within the chest and no significant pericardial effusion (Exhibit 11F page 4).

The later treatment notes showed that the claimant continued to receive therapy, counseling and medication management (Exhibit 6F page 8). However, by January 16, 2024, he reported that he was doing "okay" and things had been going "pretty well" with Latuda (Exhibit 6F page 8). He reported feeling depressed and irritable but that those symptoms were getting better (Exhibit 6F page 8). He was only advised to continue his prescription protocol (Exhibit 6F page 9). The notes indicate that he began receiving physical therapy to treat his lumbar back pain (Exhibit 8F page 89). During an examination no June 4, 2024, he reported that he had a cough, and he was suspected of having reactive airway disease/asthma with chronic cough phenotype and GERD (Exhibit 8F page 96). However, he also reported that he had not been taking any of his medications for a while (Exhibit 8F page 96). He reported having shortness of breath after walking up 12 – 14 steps to his bedroom, that his cough woke him up, he snored and frequently cleared his throat (Exhibit 8F page 96). On examination, he had a BMI of 33.71 but otherwise continued to have a mostly normal review of

systems, with normal breathing sounds, clear lungs, normal range of motion in his back and no CVA tenderness or adenopathy noted (Exhibit 8F page 97). Additionally, he had normal movement in his extremities, and no cervical lymphadenopathy, cyanosis, clubbing, edema or chest tenderness was noted (Exhibit 8F page 98). The claimant was prescribed Flonase and to obtain a methacholine challenge but no further treatment was recommended (Exhibit 8F page 100).

On July 18, 2024, he presented for a counseling session and reported that he found out he was prediabetic (Exhibit 10F page 14). He reported making lifestyle changes, but he struggled with anger (Exhibit 10F page 14). However, he had a normal mental status exam and was only advised to continue counseling once a week (Exhibit 10F page 14). He later presented for a psychiatric evaluation and reported having hallucinations and hypervigilance (Exhibit 10F page 17). He stated that he recently moved to southern Ohio and was not sure if his medications were helping him (Exhibit 10F page 17). However, he stated that he had established care with a therapist and primary care physician and was happy with his care so far (Exhibit 10F page 17). He reported having trouble sleeping, racing thoughts, irritability, restlessness, anxiety, intrusive thoughts, thoughts of death and being more talkative (Exhibit 10F page 17). However, he denied having suicidal intent or plan (Exhibit 10F page 17). On examination, he had a constricted affect, an anxious mood and circumstantial thought processes (Exhibit 10F page 21). However, he was alert, oriented, and had normal thought content and fair insight and judgment (Exhibit 10F page 21). Further, he had intact memory, normal speech and normal motor activity (Exhibit 10F page 21). Additionally, he was generally in good health, made good eye contact and had normal attention (Exhibit 10F page 21). The claimant was advised to continue Trazadone and psychotherapy would be arranged (Exhibit 10F page 23).

12

On September 6, 2024, he presented for a psychiatric medication management examination and reported that he still had a "crappy" mood, auditory hallucinations and poor sleep (Exhibit 12F page 26). However, he continued to have a mostly normal review of his psychiatric systems on examination, with full affect, normal speech and neutral/euthymic mood (Exhibit 12F page 28). His prescription protocol was adjusted, and he was advised to continue therapy and return in about 4 weeks (Exhibit 12F page 30). However, no further treatment was recommended. By September 19, 2024, he reported that he still struggled with his anger, but also stated he and his future wife were doing better (Exhibit 12F page 13). He continued to have a normal mental status exam and was only advised to continue counseling, therapy and his medication (Exhibit 12F page 13). Further, the notes indicate that overall, he demonstrated moderate improvement as evidence by his ability to share and discuss daily stressors during his session and remain under control of his thoughts and feelings (Exhibit 12F page 13).

The notes indicate that he continued to report having pain symptoms, a cough and shortness of breath (Exhibit 11F page 16: Exhibit 17F page 18). However, he continued to have a mostly normal review if systems on examination and the only treatment recommended was a change in his prescription protocol (Exhibit 11F page 18: Exhibit 17F page 18). The treatment notes showed that he began receiving group therapy along with his individual therapy and counseling (Exhibit 15F page 6). He reported being aggravated, upset and struggling to communicate with his wife (Exhibit 15F page 3). However, during an examination on October 17, 2024, he continued to have a normal mental status exam (Exhibit 15F page 3). Further, the notes indicate that he demonstrated significant improvement as he continued to participate in anger management groups and individual counseling (Exhibit 15F page 3). The claimant was advised to

13

follow up, to do his homework and focus on his ability to control his negative thoughts and not react so quickly in anger (Exhibit 15F page 4). However, no further treatment was recommended. The undersigned accounted for the claimant's treatment of medication management, physical therapy, therapy and counseling by limiting him to the above limitations of light work. However, the treatment record indicates that his symptoms were mostly adequately controlled and improved with only medications, therapies and counseling. These findings suggest that the claimant's symptoms were not as limiting as alleged, and the above residual functional capacity assessment with the above limitations should accommodate his conditions to avoid an exacerbation of his symptoms.

The record shows that the claimant's physical and mental impairments have required treatment of medication, physical therapy, therapy or counseling. The record suggests that the claimant has some difficulty with understanding, interacting, concentrating and adapting. Therefore, reasonable light functional limitations including understanding, remembering and carrying out simple instructions, not performing work requiring a specific production rate such as assembly line work or work that requires hourly quotas and being off task 5% of the workday, as set forth above are appropriate. However, the objective musculoskeletal and mental status examinations generally describe mostly intact motor and cognitive functioning. In addition, the record does not fully support the claimant's testimony regarding his restriction of activities of daily living. Rather, the claimant has participated in wide range of activities of daily living, including babysitting his grandchildren and being ordained a priest. Therefore, the medical evidence of record supports a finding that the claimant has mostly moderate limitations due to his mental impairments and could perform light work.

Such findings relative to the claimant's physical and mental impairments support a limitation to the

14

range of light work found above. However, greater limitations are not warranted by the generally normal review of his musculoskeletal, respiratory and psychiatric systems, the general normal motor and mental exam findings, the reports of improvement after treatment and the routine and conservative treatment he received (Exhibit 1F: Exhibit 2F: Exhibit 3F: Exhibit 4F: Exhibit 5F: Exhibit 6F: Exhibit 7F: Exhibit 8F: Exhibit 9F: Exhibit 11F: Exhibit 12F: Exhibit 15F: Exhibit 17F).

Tr. 33–39.

### The ALJ's Findings and Conclusions

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since February 28, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following sever impairments: depression, post-traumatic stress disorder (PTSD), degenerative disc disease, asthma, chronic obstructive pulmonary disease (COPD), and obesity. (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed in 20 CFR Part 404, Subpart P,

15

Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d)m 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can stand and/or walk for 5 hours in an 8-hour workday. He can never climb ladders, ropes or scaffolds. He can occasionally climb ramps and stairs, and occasionally stoop kneel, crouch and crawl. He should avoid more than occasional exposure to extreme cold, extreme hot and humidity. He should avoid concentrated exposure to atmospheric conditions, such as odors, fumes, dusts, gases and poor ventilation. He should avoid all exposure to hazards, unprotected heights and dangerous machinery. He can understand, remember and carryout simple instructions. He cannot perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas. He can occasionally interact with the public, coworkers and supervisors. He can deal with occasional changes in a routine work setting. He would be off task 5% of the workday.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

16

7.  The claimant was born on January 21, 1971 and was 48 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).  n

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.98).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 27–45.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence

of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the

17

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

18

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

19

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Salsburey seemingly presents one issue for review—that " the ALJ failed to account for the state agency psychologists' social interaction limitation." Doc. 7, at 10. The Court uses the word "seemingly" because Salsburey's argument is not entirely clear. And despite providing just one legal issue for review, Salsburey's introductory paragraph in his argument suggests that his argument is two-fold: (1) the ALJ failed to properly evaluate the state agency psychologists' opinions and (2) the ALJ failed to properly account for the "state agency psychologists' social interaction limitations." Doc. 7, at 10. Both of these apparent arguments are discussed in turn.

As an initial matter, the Court's review is hampered by Salsburey's manner of presentation. His argument consists of vague, or perhaps hinted-at claims of error followed by his attempt to knock down arguments that the

Commissioner might make in response. But Salsburey has to show in the first instance that the ALJ erred or that her decision is not supported by substantial evidence. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

Turning to Salsburey's first argument, he seemingly argues that the ALJ failed to properly evaluate the state agency psychologists' opinions. *See* Doc. 7, at 10–11. The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining

21

factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at \*14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ articulated the following analysis of the state agency psychologists' opinions:

> State agency psychiatric consultant Courtney Zeune, Psy.D., submitted a report and opined that the claimant had moderate limitations in the 'B' criteria listings, except the area of understanding, which she opined he had mild limitations (Exhibit 2A page 4). She opined that the claimant was expected to be capable of acceptable superficial interactions with others, to include with bosses, coworkers, and the general public and expected to be capable of appropriate concentration, persistence, and pace for effectively completing simple, routine tasks on an ongoing basis (Exhibit 2A page 7: Exhibit 3A page 7). State agency psychological consultant Carl Tishler, Ph.D., submitted a report and concurred with Dr. Zeune's past administrative findings (Exhibit 5A page 3: Exhibit 6A page 7). The undersigned finds the consultants' past administrative medical findings to be partially persuasive. While the consultants' prior administrative medical findings are supported by their explanation of the evidence that they considered in determining the claimant's functional limitations, their prior medical findings are only partially consistent with the other evidence in the record. There was additional evidence submitted at the hearing level. Specifically, the claimant's testimony and evidence that showed the claimant has a treatment history for his mental impairments

22

that would support finding those impairments as severe, with the above 'B' criteria limitations and the above mental limitations.

The notes indicate that he had some symptoms his mental impairments, and he required psychotropic medications, counseling and therapy (Exhibit 6F page 1: Exhibit 2F page 79). However, the record also showed that the claimant only received routine and conservative treatment of medication, therapy and/or counseling for his mental impairments (Exhibit 6F: Exhibit 12F: Exhibit 15F). Additionally, the evidence shows that he routinely had a mostly normal review of his psychiatric systems on examination, with normal mood and affect, thought content, and he routinely denied experiencing delusions, hallucinations, suicidal or homicidal ideations (Exhibit 2F page 69). Furthermore, he has not been hospitalized due to his mental conditions, and he was recently only advised to continue medication management, counseling and therapy to treat his symptoms (Exhibit 15F page 4). The notes indicate that his symptoms were adequately controlled or improved with only counseling, therapy treatment and medications and he routinely reported an improvement in his symptoms with treatment (Exhibit 2F page 75: Exhibit 12F page 13). This would support finding his mental impairments as severe, with the above limitations in the 'B' criteria listings and the limitations in the residual functional assessment. The undersigned finds these prior administrative medical findings persuasive only insofar as they indicate that there are indeed moderate limitations in the areas of: interacting with others; concentrating, persisting, and maintaining pace and mild limitations in the area of understanding. However, the findings provided by the consultants are vague and in non-vocationally defined language. The additional

> evidence in the record would support finding the claimant's mental impairments as severe, with the above limitations in the residual functional assessment, which are more restrictive than the ones opined by the consultants and in more policy compliant terms. Therefore, the undersigned finds the consultants' prior administrative findings to be partially persuasive.

Tr. 40–41.

Here, the ALJ provided a detailed analysis of the state agency psychological consultant's opinions, explained why they were partly persuasive, and even explained why he used different verbiage to incorporate the relevant social limitations. *Id.* Salsburey provides no developed argument that the ALJ failed to properly articulate her evaluation of the state agency psychologist's opinions as required by the regulations. Indeed, Salsburey does not cite the applicable regulations governing an ALJ's evaluation of opinion evidence. So he has forfeited any argument, to the extent he is even attempting to raise one, that the ALJ failed to apply applicable regulations for evaluating the persuasiveness of opinion evidence. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

The second facet of Salsburey's argument is difficult to pin down because it chiefly consists of his attempts to refute arguments that he supposes that the Commissioner would make. *See* Doc. 7, at 11–13. At bottom, this aspect of his argument amounts to his disagreement with the ALJ's decision not to fully adopt the language used by the state agency psychologists. *See id.* at 11–13. Salsburey, however, does not provide any citation to support the idea that the

24

ALJ was required to adopt the language that the state agency psychologists used. Indeed, he admits that the ALJ was not required to adopt their opined social limitations. *See* Doc. 7, at 11.

Nevertheless, Salsburey follows this concession with the conclusory claim that "the ALJ was required to address the inconsistency between the experts' opinion and the residual functional capacity." Doc. 7, at 11 (citing, without explanation, Soc. Sec. Ruling 96-8p, 1996 WL 374184 (Jul. 2, 1996)). Despite citing Ruling 96-8p, Salsburey provides nothing to show why this ruling supports his claim that the ALJ was required to explain the "inconsistency"—assuming there was any—between the ALJ's RFC determination and the state agency psychologists' findings. Indeed, Ruling 96-8p says that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." 1996 WL 374184, at *7. As the passage quoted above shows, the ALJ did this.

Anticipating the Commissioner's response, Salsburey provides a paragraph of speculative arguments all of which further his apparent interpretation that the ALJ simply substituted the word "occasional" for "superficial," the latter of which was used in the state agency psychologists' findings. *See* Doc. 7, at 12. But Salsburey has misinterpreted the ALJ's decision.

25

The ALJ said that there were at least two problems with the state-agency psychologists' findings that limited their persuasiveness. First, for the reasons already discussed, their "findings [were] persuasive only insofar as they indicate[d] that there [were] … *moderate* limitations in the areas of[] interacting with others." Tr. 41 (emphasis added). And second, those "findings …[were] vague and in non-vocationally defined language." *Id*. This latter point is a reference to the fact that the term *superficial* is not defined in any social security regulation. *See Mabry-Schlicher v. Comm'r of Soc. Sec.*, 2025 WL 1604376, at *4–5 (6th Cir. June 6, 2025). Putting these statements together, the ALJ wasn't fully convinced by the state-agency reviewers because, for reasons that she explained, their findings only supported "moderate" interaction limitations and, in any event, they relied on vague and undefined language. For these reasons, the ALJ assessed limitations that were not entirely consistent with those assessed by the state-agency reviewers.

It well may be that there is a difference between *superficial* and *occasional* in terms of social interactions. *See Mabry-Schlicher*, 2025 WL 1604376, at *4–5. Certainly, courts have disagreed about whether any distinction matters. *See Muoio v. Comm'r of Soc. Sec.*, No. 4:24CV2175, 2026 WL 468557, at *11 (N.D. Ohio Feb. 19, 2026). But the Court need not wade into this debate because the ALJ rejected the aspect of the state-agency reviewers' opinion that would have limited Salsburey to superficial interactions, instead finding "moderate" or "occasional" interactions to be more appropriate.

26

Salsburey, however, claims that the ALJ included a limitation for *occasional* and not *superficial* interactions "without providing any *proper* explanation." *See* Doc. 9, at 2. But this ignores the ALJ's decision. Further, Salsburey fails to provide any authority illustrating that the ALJ's explanation was improper. Indeed, even setting aside the fact that the ALJ found that the state agency psychologists' opinions were only *partly persuasive*, the ALJ was not required to include, verbatim, the state-agency reviewers' limitations in her RFC determination. *See Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"); *see also Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) ("The ALJ is required to incorporate [in the RFC] only those limitations that he or she accepted as credible.").

The remainder of Salsburey's arguments are similarly unconvincing. For instance, he says that the ALJ never found that the state agency reviewers' opinions were "inconsistent with or unsupported by the record." Doc. 7, at 13. This assertion is hard to square with what the ALJ said, particularly the statement that "their prior medical findings are only partially consistent with the other evidence in the record." Tr. 40–41.

Salsburey's argument thus ultimately comes down to a dispute about the ALJ's weighing of the evidence. But this does not provide a basis for remand because weighing the evidence is a task left solely to the ALJ. *See* 20

27

C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings) (emphasis added); *see also Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020 ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.") (citation omitted)).

Moreover, as the Commissioner points out, the ALJ's decision is supported by substantial evidence. *See* Doc. 8, at 3–4; *see also* Tr. 40–41 (specifically detailing the evidence supporting and contradicting the state agency psychologists' opinions and how those opinions are reflected in the RFC determination). Salsburey has not challenged whether the ALJ's decision is supported by substantial evidence in either his opening or reply brief, let alone shown that the ALJ's decision is unsupported by substantial evidence. So to the extent that he may be implying that substantial evidence supports his desired outcome, that assertion would be irrelevant because the fact that substantial evidence might support different outcomes is not a basis to reverse. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."); *see also Walters v. Comm's of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (explaining that a claimant bears the burden of proof for the first four steps of the sequential evaluation and that the denial of a claim at steps one through four is proper

28

unless a claimant can show the absence of substantial evidence to support the Commissioner's decision).

**Conclusion**

For all of the reasons stated, I recommend that the Court affirm the Commissioner's decision.

Dated: April 27, 2026

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).